831 F.2d 1064
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Russell HOWARD, Defendant-Appellant.
 No. 87-5411.
 United States Court of Appeals, Sixth Circuit.
 Nov. 3, 1987.
 
 Before BOYCE F. MARTIN and DAVID A. NELSON, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Appellant Russell Howard was indicted for conspiring to print and pass counterfeit Federal Reserve notes in violation of 18 U.S.C. Sec.371 and for passing or attempting to pass counterfeit Federal Reserve notes in violation of 18 U.S.C. Sec.Sec.472 and 2. After a trial by jury Mr. Howard was found guilty on both counts and was sentenced to fifteen years imprisonment. On appeal he argues, among other things, that the evidence showed he was so intoxicated at the time his friends printed and passed the counterfeit money that he could not knowingly have participated in their enterprise. Believing that there was sufficient evidence to support the jury's verdict, we shall affirm the conviction.
 
 
 2
 At the trial, Clara Beatty, a friend of Mr. Howard, testified that she began printing counterfeit money at his request sometime in May of 1986. Mr. Howard was then in jail for driving under the influence. Ms. Beatty testified that she spoke to Mr. Howard on the phone several times about printing the bogus money and that she took some of her work product to the prison for him to inspect.
 
 
 3
 On September 17, 1986, after his release from prison, Mr. Howard called Ms. Beatty at work and told her that the two of them were going to Sandy Hook on the 19th to attend a meeting. Mr. Howard mentioned, according to Ms. Beatty, that he was going to try to fool his uncle in a poker game with the false money Ms. Beatty had printed.
 
 
 4
 On September 19 Ms. Beatty picked up Mr. Howard in her car and drove to Fairborne, Kentucky, where two friends, Christy Deer and her husband Michael Deer, joined the group, as did Mr. Howard's brother, Clyde. The five individuals eventually went to a motel where, Ms. Beatty testified, they colored money she had previously printed. Ms. Betty said that Mr. Howard did not help physically, but "he was bossing ... he was telling us what to do." Ms. Beatty further testified that when they ran out of ink, she and Mr. Howard went to a paint store to get more.
 
 
 5
 Michael Deer also testified about coloring the money at the motel. He testified that Mr. Howard did not help in the coloring, but when the money dried it would be handed to Mr. Howard who would look at it to "see how it looked, see if it was turning out right." Mr. Deer said that when the ink ran out it was Christy Deer with whom Ms. Beatty went to the store for more.
 
 
 6
 There was testimony that as the money was drying, Mr. Deer and Mr. Howard discussed how they would pass it; they talked about going to garage sales and little stores and bars. Mr. Howard mentioned going to a place called the Glass Slipper. Michael Deer testified that the plan was that "I'd go in, try to pass off the counterfeit bill. If they said anything, then he'd come in and tell them it was just a joke he was pulling on them."
 
 
 7
 After leaving the motel, the five individuals stopped at a warehouse drive-thru liquor store. Mr. Howard ordered some beer and handed a counterfeit $20 bill to the clerk. The clerk stated that she had to get some change. That made Mr. Howard nervous, and he told Ms. Beatty "just to go ahead and take off because he was afraid she was calling the police about the money."
 
 
 8
 The group next headed toward Dayton, Kentucky. Mr. Deer testified that while driving up Springfield Street they saw two yard sales. Mr. Howard went to one and Mr. Deer went to the other, both taking some of the counterfeit money with them. Mr. Deer testified that he purchased something with a counterfeit bill and gave the change to Mr. Howard.
 
 
 9
 Mr. Deer testified that they stopped next at a little fruit stand, where Mr. Howard said to him, "Here. Try to pass this one here." Mr. Deer bought some tomatoes and a few apples, got change for a $20 bill, and got back in the car.
 
 
 10
 Their next stop, Mr. Deer said, was a gas station where they asked where they could buy something to drink. They were directed to the Economy Liquor Store, and Michael Deer attempted to pass a counterfeit $20 bill there. The store clerk, a Mr. Scott, became suspicious because the bill was discolored and "shined." His suspicion was heightened by the fact that Mr. Deer and Mr. Howard wandered back through the sotre, after laying the $20 on the counter, and by the fact that, in an apparent effort to distract the clerk's attention, the two men asked for directions to a place called Moorehead but kept interrupting when the clerk tried to reply.
 
 
 11
 Mr. Scott told Mr. Howard and Mr. Deer that their purchase came to $2.95. He testified:
 
 
 12
 "I grabbed the $20. I was going to see how far they wanted to go with it. If it was going to be a joke, I get them all the time. Rang it up. 2.95 out of twenty. Yeah. Threw it back at them and says [sic], "What's this supposed to be?'
 
 
 13
 At that time the older gentleman [Mr. Howard] stepped in, pushed the younger gentleman [Mr. Deer] back, took the twenty, handed it back to him. 'Here. Put your money away, son. I'll but this.' I said, 'Oh, year. I guess you will.' So he paid with three singles. And I gave him a couple more directions. Turn right at Maysville.
 
 
 14
 At that time I already knew I was going to call the police, and they left. Older gentleman came back in the store, wanted to shake my hand, said 'We're just a couple of guys trying to get over, buddy.' I said, 'I work 60 hours a week trying to get over, buddy.' And that was the deal. And I called the police, called Dayton, and they picked them up."
 
 
 15
 Mr. Scott testified that Mr. Howard did not appear to be intoxicated and did not smell of alcohol.
 
 
 16
 After the group left the Economy Liquor Store, Officer Paul Wynn pulled their car over, shined his flashlight inside it, and saw a roll of bills in the rear seat on the right side. Michael Deer, who had been sitting there, was arrested. When Officer Wynn asked defendant -Howard his name, he responded that it was Johnny Shaber. The officer asked Clara Beatty to follow him to the police station in her car, and in the course of that trip Mr. Howard told Ms. Beatty not to say his right name and to tell the police that the counterfeit money belonged to Michael Deer.
 
 
 17
 At the police station, Ms. Beatty gave the police a false name for Mr. Howard. Two different officers testified that Mr. Howard again claimed that his name was Johnny Shaber, and one of them, Officer Cobb, further testified as follows:
 
 
 18
 "The only other thing that Mr. Howard said was as we were checking in the prisoners we took Miss Beatty in one direction, Mr. Howard in the other, and he yelled to Miss Beatty that--something to the effect of, 'Don't talk to them,' or, 'Don't say anything to them, baby." '
 
 
 19
 Three officers testified that Mr. Howard was not intoxicated, although they said his brother was.
 
 
 20
 Mr. Howard and his friends were sent to the Boone County Detention Center. Mr. Deer testified that at the detention center Mr. Howard told him
 
 
 21
 "Just say you don't know nothing about it because they can't prove it .... So deny it all the way.... You know it was Clara's money. it was in possession of [sic] her car. She's the one going to get in trouble for it. So just put the blame off on her."
 
 
 22
 Mr. Howard later tried to get Mr. Deer to finger his brother, Clyde Howard. He also wanted Mr. Deer to tell the police that he was drunk; as Michael Deer testified,
 
 
 23
 "He'd say, 'you know I was drunk. We was both drunk.' He says, 'you know I don't remember nothing that happened." '
 
 
 24
 On October 28, 1986, Mr. Howard asked to speak with Officer Cobb. The officer described their conversation as follows:
 
 
 25
 A "Well, Mr. Howard stated that he knew about the counterfeit money on previous occasions and that he had known it to be--the three people to be in possession, his brother, Clyde David a Mitchell Bolander and a person--I believe his name was Billy Cherry--and that they had apparently gotten the money from Clara Beatty, who was the printer. Mr. Howard went on to state that on the morning of his arrest, September 19th, he was picked up at his house where he lives with Elanore Appleton by Ms. Beatty. And then them along with the others went to a hotel in the Dayton area.
 
 
 26
 At the hotel Clara Beatty colored the money. Mr. Howard stated that he sat on the bed and had a drink while this was going on and that when this process was complete they placed the money in the trunk of the car and went toward Kentucky, or to Sandy Hook, Kentucky. Mr. Howard stated that when they got to Bellevue, Kentucky, that they went to the liquor store at which time himself [sic] and Michael Deer went inside and Mr. Deer handed the counterfeit money to the cashier at which time Mr. Howard took genuine currency from his own pocket and paid for the drinks. And they left.
 
 
 27
 Q All right.
 
 
 28
 A They were then pulled over by the Dayton Police Department.
 
 
 29
 Q That's fine. Did he mention anything to you about suffering from any blackouts?
 
 
 30
 A No, sir, he did not.
 
 
 31
 Q Did he indicate to you in anyway that he didn't know how they got to the hotel?
 
 
 32
 A No, sir, he did not.
 
 
 33
 Q Did he indicate to you that he didn't recall leaving the hotel?
 
 
 34
 A No, sir, he did not."
 
 
 35
 Mr. Howard argues in his brief that the government did not prove that it was he who passed the counterfeit money. He maintains that Michael Deer was the one who attempted to pass the counterfeit $20 bill at Economy Liquor Store and that the government did not show that Howard participated in the printing of the money. Furthermore, he contends, he
 
 
 36
 " ... testified that he could not remember a number of events that occurred on September 19, 1986. He could not remember going to the Red Horse Motel, where the money was inked and dried. (Russell Howard at TR 89). This could be explained by his condition at the time. The Defendant-Appellant had consumed a large amount of alcohol on September 19, 1986, although the exact quantity is not known. The Government did not dispute the fact that the Defendant-Appellant was intoxicated. The expert witness, Peter Ganshirt, testified that an alcoholic, such as the Defendant-Appellant, could lose consciousness, or blackout, event though (sic) the motor functions would still be intact. (Peter Ganshirt at TR 138). Such blackout spells would account for the Defendant-Appellant's loss of memory. A person suffering from such a blackout would not be able to appreciate what he was doing or saying, or form the requisite criminal intent. (Peter Ganshirt at TR 138). When suffering from the blackout spells, Russell Howard would have been unable to form the intent to defraud a third person."
 
 
 37
 Mr. Howard also argues that the government did not prove that he knew the bills were counterfeit and that he was convicted of a conspiracy merely because he had associated with four individuals who were passing counterfeit bills. In an effort to discredit Ms. Beatty and Mr. Deer, he points to certain supposed discrepancies in their testimony. Thus he notes that Clara Beatty testified that Mr. Howard was bossing people around at the Red Horse Motel and that Mr. Howard accompanied Ms. Beatty to get more ink, while Michael Deer did not mention that Howard was bossing anyone around and testified that it was his wife who accompanied Ms.' Beatty to get more ink.
 
 
 38
 As the government notes in its brief, however, there was ample evidence of Mr. Howard's guilt:
 
 
 39
 "There was ample testimony from his codefendants that the money was printed at his request; that he viewed the initial attempts to print the money; that he told Deer about it prior to September 19th; that he told Michael Deer that they could make money on the way to Kentucky; that he discussed with Deer the various places to pass money and kept the change when they were successful; that defendant was well aware that the money was being colored at the motel; and that he tried to get Beatty and Deer not to talk or to blame someone else. There was also testimony from the remaining witnesses that Howard participated in the attempted pass at Economy Liquor and tried to act as though nothing was amiss; that he attempted to hide his true identity and tried to get Deer and Beatty not to talk or to lie about his involvement; and, contrary to his direct testimony, he acknowledged to Agent Cobb that he remembered being in the hotel and at Economy Liquor and remembered what occurred at both places. Viewed in the light most favorable to the government, there was sufficient evidence to sustain the convictions returned by the jury."
 
 
 40
 Mr. Howard in essence has argued that his testimony and that of his expert had greater credibility than the testimony of all the other witnesses. A jury's determination of credibility, however, is a matter that this court cannot review upon appeal. United States v. Scales, 464 F.2d 371, 373 (6th Cir. 1972). The conviction is AFFIRMED.